COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Fulton, Lorish and White
Argued at Norfolk, Virginia


ANTONIO TOBIAS CUFFEE

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0093-23-1                      JUDGE JUNIUS P. FULTON, III
                                                    OCTOBER 29, 2024
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
                              John W. Brown, Judge

              Lauren Brice, Assistant Public Defender (Virginia Indigent Defense
              Commission, on briefs), for appellant.

              Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
              Miyares, Attorney General, on brief), for appellee.


        Antonio Tobias Cuffee appeals his convictions, following a jury trial, on one count of

possession of a Schedule I/II drug; four counts of possession of drugs with intent to distribute; one

count of possession of a firearm while possessing a Schedule I/II drug; three counts of possession of

a firearm while possessing with intent to distribute a Schedule I/II drug; and one count of attempting

to flee from a law enforcement officer.  On appeal, Cuffee asserts that the trial court erred when it

refused to dismiss a prospective juror for cause.  He also asserts that the evidence was insufficient to

prove he knew that one of the nine separate plastic bags recovered from him contained a mixture of

both fentanyl and heroin or that he knew the recovered firearm was in the vehicle.  For the

following reasons, we disagree and affirm the convictions.

_____

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

During voir dire, prospective Juror 5 revealed he was a federal law enforcement officer who often led investigations and that Commonwealth witness Officer Erin Cutburth's name sounded familiar. Next, the prosecutor asked if the venire had a family member, close friend, or knew anyone in the Commonwealth's Attorney's Office. Prospective Juror 5 indicated that he had contact with all of the Commonwealth's Attorneys' offices as part of his employment. The prosecutor asked, "[A]re you able to judge a police officer's credibility as you would any other witness?" The venire indicated that they could. The prosecutor asked if the jurors knew "police officers personally" and if "that relationship [would] affect" their ability to judge the testimony fairly and impartially. Juror 5 reiterated that he was a law enforcement officer and therefore had relationships with law enforcement officers. He affirmed that he "could be completely impartial."

At the close of voir dire, the parties and the court discussed which jurors to question individually. The prosecutor and defense attorney both indicated that they wished to speak to prospective Juror 5. During his individual voir dire, prospective Juror 5 indicated that he was employed as a Federal Bureau of Investigation (FBI) Special Agent for the last 15 years and that he investigated financial fraud crimes. He acknowledged he sometimes worked with state police and the Commonwealth's Attorneys' offices. He had contacted a Chesapeake assistant

Commonwealth's attorney in the last few months in the course of his employment. When asked about his work with the Commonwealth's Attorneys' offices, he noted that he "coordinate[s] with the Commonwealth attorney. Sometimes, cases start at the state level and get referred to federal prosecution or a federal agency, and [he] investigate[s] them federally." He noted that he never presented evidence to a Commonwealth's Attorney's office. He acknowledged that although he investigated financial fraud, his cases sometimes involve guns and drugs.

When asked if his occupation and work with law enforcement agencies would affect his impartiality, Juror 5 stated several times that it would "absolutely not," and he asserted that his job was to be fair and impartial. Cuffee's attorney asked, "[H]ow can you be impartial against a criminal defendant who is in the same situation of the people that you investigate and pass the investigation to the attorney?" Prospective Juror 5 stated, "Not all investigations result in prosecution, sir. The evidence speaks for itself." Cuffee's attorney then asked, "[Y]ou can't recall a time when you presented evidence to the grand jury where you felt the person shouldn't be prosecuted?" Juror 5 asserted, "Like I said, sir, feeling is not a proper word. You present the evidence, and the decision is made from there."

Cuffee moved to strike prospective Juror 5 for cause. He asserted that prospective Juror 5's assertions that he could be fair and impartial were incredible and that his occupation as a federal investigator meant he could not be impartial. The trial court denied the motion.[1]

At trial, the evidence established that on September 21, 2020, Officer Aaron Weeks responded to a complaint of suspected drug activity in the parking lot of the 33rd Precinct, a bar on Chesapeake Avenue. Officer Weeks met Officer Erin Cutburth at the location. After the officers found no one in the parking lot, they monitored the lot from across the street. While surveilling

---

[1] Prospective Juror 5 did not serve on the jury as he was peremptorily struck by the defense.

- 3 -

the lot, Officer Weeks observed an SUV drive into the lot and park. Then a grey Kia arrived and parked next to the SUV. Within a minute and a half to two minutes, the driver of the SUV exited the front passenger side of the Kia and walked toward the nearby bar. Officer Weeks admitted that he never saw the driver of the SUV enter the Kia but only observed his exit. Shortly after the driver of the SUV exited the Kia, it pulled out of the parking lot and drove toward Officer Weeks. As the Kia drove past, Officer Weeks observed that it had one occupant. Officer Weeks, driving a marked police car, followed the Kia.

The Kia drove a short distance, turned, and abruptly pulled over to the side of the road. Officer Weeks continued past the vehicle. As Officer Weeks passed the Kia, the driver, later learned to be Cuffee, exited the vehicle and stood between the vehicle and the open driver's door. Officer Weeks executed a U-turn and drove past the Kia again.

Officer Weeks saw Cuffee walking toward an intersection, so the officer drove to the intersection and parked out of sight. As Cuffee entered the intersection, he looked up, saw Officer Weeks's marked police vehicle, and immediately reversed direction. Officer Weeks pulled his vehicle into the intersection and observed Cuffee walk up to the front of a nearby residence. Officer Weeks approached Cuffee and detained him; the location was five houses away from the grey Kia.

While Officer Weeks detained Cuffee, he requested Officer Cutburth and K-9 Officer Kirby Standridge's assistance. Officer Cutburth arrived about a minute later and talked with Cuffee; she noticed that Cuffee appeared nervous and that he had two phones.

Meanwhile, Officer Standridge conducted an open-air sniff of the grey Kia with his drug detection dog. The dog alerted at the left-rear wheel well of the Kia. After the alert, Officer Standridge shined his flashlight into the vehicle and observed a black handgun in the driver's footwell in plain view. Officer Standridge returned to where Cuffee sat on the curb and informed Officer Weeks of the handgun.

- 4 -

The officers then tried to handcuff Cuffee, but he resisted the officers' attempts for seven minutes. During the struggle, Cuffee shoved his hand into his jacket pocket. Officer Weeks plunged his hand into that same pocket. When Officer Weeks's hand touched Cuffee's hand, Officer Weeks felt a plastic bag in Cuffee's grasp. Officer Weeks removed the bag from Cuffee and discovered it contained nine individually packaged baggies. Officer Weeks also recovered a "wad" of U.S. currency from Cuffee's right front pants pocket, the Kia's keys off the ground next to Cuffee after he was placed in handcuffs, and two cellphones that had been in Cuffee's hands while interacting with officers prior to his arrest. After placing Cuffee in a patrol vehicle, Officers Weeks and Standridge searched the Kia and recovered a handgun from the driver's side floorboard.

Later testing determined that six of the nine individually wrapped baggies contained various amounts of cocaine.[2] Item 2 contained 0.8237 gram of 3, 4-methylenedioxy-N-benzylcathinone ("BMDP"). Item 6 held nine blue oval tablets marked with "Y" and "2 0" and proved to be alprazolam. Item 9 contained 3.34 grams of a "brown solid material" determined to be a mixture of heroin and fentanyl. The U.S. currency consisted of four $100 bills, eight $50 bills, forty-seven $20 bills, nine $10 bills, nine $5 bills, and eight $1 bills.

Detective Ashley Souther testified as an expert in the sale and distribution of controlled substances.[3] Detective Souther explained that drug dealers often have two cellphones. One phone is usually used for family and friends while the second phone is used to conduct business. Detective Souther noted that the U.S. currency recovered from Cuffee was significant because

[2] Item 1 contained 1.08 grams of cocaine, Item 3 contained 0.4511 gram of cocaine, Item 4 contained 3.88 grams of cocaine, Item 5 contained 23.22 grams of cocaine, Item 7 contained 12.11 grams of cocaine, and Item 8 contained 5.54 grams of cocaine.

[3] Detective Souther was qualified as an expert due to her extensive experience and training as a uniformed officer and detective working in the Vice and Narcotics Section of the Chesapeake Police Department.

people do not usually carry large quantities of cash, cash is often used during drug transactions, and Cuffee had almost $2,000 of U.S. currency in predominately small denominations.

Detective Souther noted that drug dealers often possess an assortment of controlled substances in various quantities to supply the needs of a variety of clientele. Dealers will even take powder cocaine, mix it with baking soda and water, and then microwave it to turn it into crack cocaine. Detective Souther testified that crack cocaine can then be sold in smaller quantities such as .1 gram as opposed to powder which is typically sold in quantities no less than a half-gram. Detective Souther further explained that it is not unusual for dealers to "mix [heroin] with fentanyl to make it stronger" which "makes the users want to go come back for more" and allows dealers to charge a higher price.

Detective Souther discussed each of the substances found on Cuffee's person. Detective Souther noted that cocaine is sold in various quantities—half-gram, gram, 3.5 grams (often referred to an "eight ball"), a half-ounce, or an ounce. The six baggies of cocaine recovered from Cuffee were all different quantities, varying from a half-gram to almost an ounce totaling 47 grams of cocaine.[4] Typically, a cocaine user will use a half-gram to a gram a day. The 47 grams recovered from Cuffee would last a cocaine user between 47 days and 94 days. Detective Souther opined that possession of such a quantity of cocaine was inconsistent with possession for personal use.

Detective Souther opined that possession of the nine oval blue pills labeled "Y" and "2 0" and determined to be alprazolam or Xanax was inconsistent with possession for personal use. She reached this conclusion because the pills were not kept in a pill bottle and were found with multiple other narcotics. Detective Souther explained, "Alprazolam has also been sold in

---

[4] Detective Souther noted that four of the bags recovered from Cuffee appeared to contain powder cocaine and two of the bags appeared to contain crack cocaine.

conjunction with cocaine to counteract the effects of the cocaine." Detective Souther believed the BMDP recovered from Cuffee was consistent with personal use because officers only found a small amount in one baggie.

Detective Souther stated that the 3.34 grams of a brown substance determined to be heroin and fentanyl was inconsistent with possession for personal use. Detective Souther noted that heroin users typically use half-gram to a gram a day and immediately use the drugs they buy. Thus, the 3.34-gram mixture recovered from Cuffee would last a typical user three and a half to six and a half days. In her opinion, a dealer would purchase an "eight ball" to repackage and sell to multiple users later.

Lastly, Detective Souther noted that officers found no ingestion devices such as straws, rolled up bills, pipes, or syringes on Cuffee's person or in his vehicle. Instead, officers found a firearm in Cuffee's vehicle. Detective Souther noted that dealers often carry a firearm for their protection because "they . . . typically will have either a large amount of cash, a large amount of drugs, either/or both."

On cross-examination, Detective Souther admitted that she could not tell when a suspected drug contains fentanyl without a lab report. She noted, however, that mixing heroin and fentanyl has become "more of a recent thing in the past few years." She noted that dealers do this to increase the product's potency, to entice users to buy from them, and to allow dealers to charge a higher price. Detective Souther opined that in her experience, the price per gram for heroin would be between $80 and $100, whereas the price range for heroin mixed with fentanyl would be about $100 to $120. The Commonwealth also entered Cuffee's two prior conviction orders for possession of cocaine with intent to distribute into evidence.

At the conclusion of all the evidence, the jury convicted Cuffee of the charges and the trial court sentenced him to 90 years and 12 months of incarceration with 45 years suspended. Cuffee appeals.

ANALYSIS

I. Juror Strike

Cuffee contends that the trial court erred when it refused to strike prospective Juror 5 for cause. He argues that active law enforcement officers are inherently biased against criminal defendants, and that this Court should adopt a per se rule disqualifying current law enforcement officers from sitting on a venire. In the alternative, Cuffee argues that prospective Juror 5 "should have been struck from the panel because his employment as a federal law enforcement officer and his close ties to the Chesapeake Commonwealth's Attorney's Office made him unable to be impartial." Although prospective Juror 5 claimed that he could be impartial, Cuffee argues that the trial court should not have trusted his assertion.

The right to an impartial jury is protected by the United States and Virginia Constitutions and by statute. U.S. Const. amend. VI; Va. Const. art. I, § 8; Code §§ 8.01-357, -358. Therefore, "[t]he court and counsel for either party shall have the right to examine under oath any person who is called as a juror therein." Code § 8.01-358; *see* Rule 3A:14. If after questioning it appears to the trial court a juror "has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law." *Keepers v. Commonwealth*, 72 Va. App. 17, 42 (2020) (quoting *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 60-61 (2011)).

Because the trial court is "able to see and hear each member of the venire respond to questions posed" during voir dire, it "is in a superior position to determine whether a prospective juror's responses during voir dire indicate that the juror would be prevented from or impaired in

performing the duties of a juror as required by the court's instructions and the juror's oath." *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005). "Juror impartiality is a question of fact, and a trial court's decision to seat a juror is entitled to great deference on appeal." *Huguely v. Commonwealth*, 63 Va. App. 92, 121 (2014) (quoting *Lovos-Rivas*, 58 Va. App. at 61). Accordingly, the decision to retain or exclude a prospective juror "will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion." *Barrett v. Commonwealth*, 262 Va. 823, 826 (2001). In determining whether the trial court abused its discretion in refusing to strike Juror 5, this Court must consider the "entire voir dire, not just isolated portions." *Juniper v. Commonwealth*, 271 Va. 362, 401 (2006).

"*[P]er se* rules of disqualification which are based on 'a presumption of [juror] bias or prejudice,' are disfavored in Virginia." *Bay v. Commonwealth*, 60 Va. App. 520, 531 (2012) (second alteration in original) (quoting *McGann v. Commonwealth*, 15 Va. App. 448, 454 (1992)). The Supreme Court of Virginia had affirmatively found that there is no per se disqualification rule for a prospective juror who has an association with law enforcement, is a former law enforcement officer, or is a retired probation and parole officer. *See Clozza v. Commonwealth*, 228 Va. 124, 135 (1984); *Gray v. Commonwealth*, 233 Va. 313, 339 (1987); *Strickler v. Commonwealth*, 241 Va. 482, 492 (1991). Although there are limited instances where the status of a prospective juror creates a per se disqualification, none of them applies here.

Here, prospective Juror 5 explained that he was an FBI agent who investigated financial fraud and that sometimes his investigations involved guns and drugs. He also acknowledged that he sometimes worked with Commonwealth's Attorneys upon referral of cases and that he had talked with a Chesapeake assistant Commonwealth's attorney several months before Cuffee's trial. Prospective Juror 5 also acknowledged that Officer Cutburth's name seemed familiar to him.

The record, however, failed to establish that Juror 5 had any knowledge of the facts of Cuffee's case. Although prospective Juror 5 may have known Officer Cutburth, that circumstance alone was insufficient to disqualify him. *See Perez v. Commonwealth*, 40 Va. App. 648, 658 (2003) (holding that a juror's single contact with a witness, but no contemporaneous or continuing relationship with him, is not the type of relationship that would disqualify a person from a jury). Further, the trial court recognized that prospective Juror 5 sometimes communicates with Commonwealth's Attorneys in the course of his employment. Yet, the trial court found that those conversations appeared to be referrals to his office regarding financial fraud and not cases such as Cuffee's, though some of the cases he worked on involved guns and drugs. Lastly, prospective Juror 5 repeatedly asserted that he could be fair and impartial. Whether to believe prospective Juror 5's assertions was a factual determination for the trial court.

We find no abuse of discretion in the trial court's refusal to strike Juror 5 for cause.

## II. Sufficiency of the Evidence

When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one. Appellate courts are not tasked with "say[ing] that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt . . . as an original proposition[.]" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (second alteration in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). Answering that question is the province of a factfinder, whether judge or jury, in a trial court. Rather, for an appellate court, "[t]he only 'relevant question is . . . whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (emphasis added) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

In answering this limited question, "[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v.*

- 10 -

*Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). As a result, an appellate court is *required* to "review the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court," *Commonwealth v. Perkins*, 295 Va. 323, 323 (2018) (internal quotation marks omitted) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 236 (2016)), and to "accord the Commonwealth the benefit of all reasonable inferences deducible from the evidence," *Brown v. Commonwealth*, 278 Va. 523, 527 (2009). An appellate court may neither find facts nor draw inferences that favor the losing party that the factfinder did not. This remains so even when the factfinder *could* have found those facts or drawn those inferences, but exercising its factfinding role, elected not to do so. If, viewed in this manner, the evidence and the supporting inferences are "sufficient to support the conviction, the reviewing court is not permitted to substitute its own judgment for that of the trier of fact, even if its opinion might differ from the conclusions reached by the trier of fact." *Jordan v. Commonwealth*, 286 Va. 153, 156-57 (2013). An appellate court that fails to defer to the factfinder in such a circumstance has committed "an abuse of [its] appellate powers." *Barney*, 302 Va. at 97.

## A. Cuffee's Knowledge of Fentanyl in Item 9

Cuffee argues that the evidence failed to prove he knew Item 9 contained a mixture of heroin and fentanyl. Cuffee notes that he made no statements to the officers that indicated that he knew Item 9 contained fentanyl.[5] Further, veteran police officers at the scene "could not tell Item 9 contained multiple controlled substances" which the certificate of analysis described as a "brown, solid material." Additionally, he notes that the Commonwealth did not seek to charge him with fentanyl related crimes until after the certificate of analysis had returned. He contends that to affirm his conviction would hold him strictly liable for the fentanyl found in Item 9. This,

---

[5] Cuffee neither testified in his own defense at trial nor offered any evidence following the Commonwealth's case-in-chief.

he contends, conflicts with Code § 18.2-248's requirement that the Commonwealth prove his knowledge of the nature and character of each controlled substance found.

"It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor*, 294 Va. at 512). "Circumstantial evidence is not 'viewed in isolation' because the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [factfinder]' to conclude beyond a reasonable doubt that a defendant is guilty." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). "Circumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, such as proof of intent or knowledge, it is practically the *only* method of proof." *Parks v. Commonwealth*, 221 Va. 492, 498 (1980). "[G]uilty knowledge need not be directly proved. It may be shown by circumstances." *Reaves v. Commonwealth*, 192 Va. 443, 451 (1951).

"[I]t shall be unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or distribute a controlled substance or an imitation controlled substance." Code § 18.2-248(A). To support a conviction, "[t]he Commonwealth [i]s required to prove that [the] defendant 'intentionally and consciously possessed' the [fentanyl], either actually or constructively, with knowledge of its nature and character, together with the intent to distribute it." *Wilkins v. Commonwealth*, 18 Va. App. 293, 298 (1994) (en banc) (quoting *Josephs v. Commonwealth*, 10 Va. App. 87, 99-102 (1990) (en banc)).

Recently, we considered the circumstance in which the defendant was convicted for possessing multiple controlled substances when he possessed a mixture containing more than one

controlled substance. *Camann v. Commonwealth*, 79 Va. App. 427 (2024) (en banc). In *Camann*, while investigating possible criminal activity not involving drug possession, an officer speaking with Camann noticed that Camann appeared to be hiding something under his shoe. *Id.* at 432. Camann moved his foot enough to reveal aluminum foil underneath. *Id.* At the officer's instruction, Camann removed his foot and revealed a blue plastic straw and a piece of aluminum foil with burnt residue. *Id.* Officers detained Camann and discovered a cellophane wrapper in Camann's wallet containing a white powder. *Id.* Testing revealed that the white powder was a mixture of fentanyl, a Schedule II controlled substance, and etizolam, a Schedule I controlled substance. *Id.* at 432-33. At trial, Camann testified that he was a drug *user* and that he knew the white powder was fentanyl but denied knowing that it also contained etizolam. *Id.* at 433 (emphasis added). He was convicted for possessing both fentanyl and etizolam.

This Court found that the Commonwealth failed to prove that Camann knew that the mixture contained etizolam and reversed that conviction. We reiterated that despite "whatever practical inconveniences may arise when the Commonwealth seeks multiple convictions for possessing a single mixture, [this Court] cannot dispense with the fundamental requirement for *each* conviction that 'knowledge is an *essential* element of the crime.'" *Id.* at 441 (quoting *Young v. Commonwealth*, 275 Va. 587, 591 (2008). This Court noted, in *Camann*, that the Commonwealth "could seek to prove knowing possession of two controlled substances in a mixture by showing that the defendant knew and used the street name of the mixture found in his possession." *Id.* at 440-41. Camann's counsel also asserted that the Commonwealth could seek to prove this knowledge by offering "expert testimony that two drugs are commonly sold together, or that the defendant had been previously convicted of possessing the drugs found in the mixture." *Id.* at 441 n.11. However, the methods of proof suggested in *Camann* is not an exhaustive list, and circumstantial evidence can be used to establish knowledge as well. As this Court noted in *Holloway v. Commonwealth*, 57

- 13 -

Va. App. 658 (2011), "[c]ircumstantial evidence is as competent [as direct] and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Id.* at 665 (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)).

It is worth noting an important distinction between the defendant in *Camann*, and the defendant here. In *Camann*, the evidence established mere possession and the defendant admitted to being a drug *user* whereas here, Cuffee was a known drug *dealer* as evidenced by his prior convictions for possession with intent to distribute.[6] Unlike a mere user of illicit narcotics who is motivated by the intoxicating effects of the substance, a dealer is motivated by profit. The more desirable a dealer makes their product, the greater the opportunity to increase that profit. The evidence in *Camann* was undisputed to establish that Camann possessed the drugs for personal use, whereas here the evidence overwhelmingly establishes that Cuffee possessed the drugs recovered on his person with the intent to distribute them. In *Camann*, police officers recovered only a cellophane bag from the defendant containing 0.056 gram of a mixture of fentanyl and etizolam after observing Camann attempting to hide what the officers suspected were illicit substances under his shoe.[7] Here, unlike the situation in *Camann*, where there was no indication of the distribution of illegal substances, officers were alerted to possible drug dealing at the 33rd Precinct and observed suspicious activity involving the Kia that Cuffee was driving and the driver of an SUV who

---

[6] On brief, Cuffee only challenges his conviction for possession of fentanyl with the intent to distribute, third or subsequent offense. However, because the evidence of his knowledge of the presence, nature, and character of the fentanyl is supported by the evidence establishing Cuffee's intent to distribute the various Schedule I/II drugs recovered from him, we recite in detail the evidence which supports that reasonable inference.

[7] The officers in *Camann* also recovered 50 tablets containing clonazepam and aluminum foil containing an unknown substance that was not tested for narcotics. Camann was not charged for his possession of the substance in the aluminum foil and his conviction for possession of the clonazepam was not at issue on appeal.

subsequently entered the 33rd Precinct after officers observed him sit in the passenger side of the Kia that Cuffee was driving for about a minute and a half. When the Kia backed out of the parking lot, Officer Weeks followed the vehicle in his marked Chesapeake police vehicle and continued observing Cuffee's movements while driving the Kia and on foot, before determining he had reasonable suspicion to detain Cuffee. Subsequent to this detention, officers discovered nine individually packaged plastic baggies of controlled substances, nearly $2,000 in various denominations, and two cell phones on Cuffee's person. Whereas officers in *Camann* recovered aluminum foil and a straw consistent with drug ingestion from under the defendant's foot, the officers in this case found no ingestion devices on Cuffee's person or in his vehicle. Additionally, officers found a handgun in the driver's footwell of the Kia abandoned by Cuffee. Consequently, Cuffee was charged with multiple counts of possession with the intent to distribute a controlled substance, not just simple possession. Moreover, the Commonwealth presented an expert in the sale and distribution of illicit narcotics.

The jury alone, as the trier of fact, draws the conclusion as to the defendant's mental state. *See Parham v. Commonwealth*, 64 Va. App. 560, 566 (2015).[8] The expert opinion testimony provided by Detective Souther is but one piece of evidence the jury takes into consideration when

---

[8] The dissent cites the recent decision of the Supreme Court of the United States, *Diaz v. United States*, 144 S. Ct. 1727 (2024), to highlight how expert testimony combined with additional evidence can allow a reasonable inference of guilt. There, the defendant challenged the admission of testimony from a Homeland Security Special Investigations Agent that in his expert opinion drug traffickers "*generally* do not entrust large quantities of drugs to people who are unaware they are transporting them." *Id.* at 1731 (emphasis added). The Supreme Court found that because the agent did not opine about whether this specific defendant "'did or did not have a mental state or condition that constitutes an element of the offense charged or of a defense,'" his testimony was admissible and was simply "evidence for the jury to consider or reject when deciding whether [the defendant] in fact knew about the drugs in her car." *Id.* at 1734. While the admissibility of Detective Souther's expert testimony is not at issue here, *Diaz* guides our analysis for the proposition that the jury alone draws the conclusion of mental state and expert testimony about general characteristics of a certain group is simply another piece of circumstantial evidence jurors can use in determining whether a defendant possessed the requisite mental state.

determining whether Cuffee had knowledge of the presence of fentanyl in the mixture he possessed. Detective Souther opined that drug dealers commonly have multiple cell phones, firearms, and large amounts of U.S. currency in various denominations in their possession. She further testified that in her experience as a narcotics detective, it has become more common for dealers to possess a mixture of heroin and fentanyl because the fentanyl increases the potency of the heroin, entices users to come back for more, and allows the dealers to charge a higher price. Taking this testimony into consideration with the other evidence presented by the Commonwealth, including the two cell phones, firearm, and large amount of U.S. currency in Cuffee's possession as well as the various quantities of cocaine and other illicit drugs, including the mixture of heroin and fentanyl discovered on his person, it was reasonable for the jury to conclude that Cuffee not only possessed this mixture of heroin and fentanyl with the intent to distribute it, but also that he did so knowingly, being fully aware of the nature and character of the both the heroin and fentanyl contained therein.

In addition to Detective Souther's expert testimony, the evidence of Cuffee's previous experience in the distribution of Schedule I/II substances, as shown by the Commonwealth's introduction of his previous convictions for possession with intent to distribute cocaine, certainly indicate his familiarity with the methods employed by drug dealers to augment controlled substances. These methods include "cooking" cocaine to produce crack cocaine, increasing its potency. At trial, Detective Souther testified that four of the bags recovered from Cuffee appeared to contain powder cocaine and two of the bags appeared to contain crack cocaine, further indicating that Cuffee is familiar with methods of augmenting controlled substances. This circumstantial evidence leads to the reasonable inference that Cuffee, armed with his experience as a dealer of illicit narcotics and motivated by profit, was aware of the practices that dealers employ to increase the desirability of their wares and thus had the requisite knowledge of the presence of fentanyl in the mixture. Considering all the evidence presented at trial, namely the variety of drugs in various

quantities, including the "eight ball" of a mixture of heroin and fentanyl, the firearm seized from Cuffee's car, the large quantities of cash, the two cell phones he was carrying at the time of his arrest, the lack of any ingestion devices recovered by responding officers, Cuffee's history of drug dealing, and Detective Souther's unrebutted testimony about the fact that it is not "unusual" for drug dealers to sell a mixture of heroin and fentanyl in recent years such that it has become an increasingly common practice of drug dealers in this area, a reasonable factfinder could conclude, beyond a reasonable doubt, that as a sophisticated and experienced dealer of various illicit narcotics, Cuffee knew that Item 9 was a mixture of fentanyl and heroin and that he possessed it with the intent to distribute.

### B. Constructive Possession of the Firearm

Cuffee also argues that the evidence failed to prove that he constructively possessed the recovered firearm. He asserts that he made no furtive movements, did not attempt to escape after he was detained, and made no statements that tended to show he knew about the gun. Further, no forensic evidence linked him to the firearm. He notes that it was dark that evening and officers did not testify about the visibility of the street that evening. He contends that the black gun could not be seen against the dark floormats in the dark car. He was also not the only person who drove the car. He noted that his mother owned the Kia. Finally, Cuffee asserts that the Commonwealth's own evidence creates a possibility that another person may have stashed the firearm in the Kia while officers tracked and detained him. Consequently, he argues, the evidence established only that he was in proximity to the firearm.

"[M]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (second and third alterations in original)

(quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). "By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Id.* (alteration in original) (quoting *Haskins*, 44 Va. App. at 9). "While a factfinder may not arbitrarily disregard a reasonable doubt, whether 'the hypothesis of innocence is reasonable is itself a "question of fact," subject to deferential appellate review.'" *Burton v. Commonwealth*, 58 Va. App. 274, 285-86 (2011) (quoting *Clanton*, 53 Va. App. at 572).

Code § 18.2-308.4(C) "prohibits the simultaneous possession of a firearm while in possession of a controlled substance with the intent to distribute it." *Hunter v. Commonwealth*, 56 Va. App. 50, 57 (2010). To prove that a defendant constructively possessed a firearm, "the Commonwealth must present evidence of acts, statements, or conduct by the defendant or other facts and circumstances proving that the defendant was aware of the presence and character of the firearm and that the firearm was subject to his dominion and control." *Bolden v. Commonwealth*, 275 Va. 144, 148 (2008) (quoting *Rawls v. Commonwealth*, 272 Va. 334, 349 (2006)). Proximity to the firearm "is a circumstance probative of possession and may be considered as a factor in determining whether the defendant possessed the firearm." *Id.* Further, as the Supreme Court noted in *Smallwood v. Commonwealth*, 278 Va. 625, 631 (2009), possession does not always have to be exclusive, the fact that a defendant could have had actual, exclusive possession and that their access to the firearm was not restricted in any way is sufficient to establish possession.

Here, the evidence at trial established that Cuffee was the driver and sole occupant of the Kia. As Officer Weeks drove past Cuffee the first time, Cuffee stood immediately beside the driver's side of the Kia with the front door open. After the police detained Cuffee, Officer Standridge observed a black gun in plain view in the driver's footwell. Officer Weeks recovered a black handgun near where the driver's feet would have been if seated in the vehicle. The jury

was shown body camera footage and photographs of the firearm's recovery. Upon these facts and circumstances, a reasonable factfinder to conclude beyond a reasonable doubt that Cuffee knew of the gun in the vehicle, that it was subject to his dominion and control, and that he constructively possessed the recovered firearm.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*

Lorish, J., dissenting, in part.

Before our en banc decision in *Camann v. Commonwealth*, 79 Va. App. 427 (2024) (en banc), Cuffee was tried and convicted for two counts of possession with the intent to distribute (PWID) based on a single bag containing an eight ball of suspected heroin—one count for the heroin, and one count for fentanyl. His counsel adamantly argued that the evidence failed to prove Cuffee knew there were two substances in the bag. Counsel pointed to the description on the evidence inventory as "suspected heroin," that the Commonwealth's expert witness could not tell that the mixture contained fentanyl by looking at it, that the fentanyl charge was only added after the laboratory analysis came back, and that there was no other evidence presented that showed Cuffee knew there was fentanyl mixed into the heroin. The trial court held that it did not matter because "the Commonwealth doesn't have to prove that you knew of the specific substance and not others" and that he was responsible for whatever he possessed. But in *Camann*, we held that "every conviction under Code § 18.2-250 requires *knowing* possession" and so "when the Commonwealth seeks two convictions for possessing a mixture containing more than one controlled substance, the Commonwealth must prove that the defendant knew there were at least two controlled substances in the mixture." 79 Va. App. at 440.

It is clear after *Camann*, then, that the trial court erred by holding that the Commonwealth did not have to prove Cuffee "knew there were at least two controlled substances in the mixture." But this is a sufficiency-of-the-evidence challenge appeal. So even though the jury in Cuffee was not asked to assess whether the eight ball contained both heroin *and* fentanyl, I agree with my colleagues that, under our precedent, we have to consider whether the evidence was sufficient for any reasonable factfinder to have reached that conclusion. And I agree with my colleagues that "[a]ppellate courts are not tasked with "'say[ing] that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt . . . *as an original*

- 20 -

*proposition*[.]"'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (third alteration in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). Instead, the relevant question is "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024) (quoting *Barney*, 302 Va. at 97). Finally, I agree that, in reviewing the direct and circumstantial evidence presented below, we do so in the "'light most favorable' to the Commonwealth," *Commonwealth v. Perkins*, 295 Va. 323, 323 (2018) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 236 (2016)), affording the Commonwealth "the benefit of all reasonable inferences deducible from the evidence," *Brown v. Commonwealth*, 278 Va. 523, 527 (2009).

We part ways on the line between "reasonable inferences" and speculation. Inferences are reasonable only if they can be reached "without resorting to speculation or conjecture." *McGuire v. Hodges*, 273 Va. 199, 208 (2007). "While the fact finder is certainly permitted to draw reasonable inferences from the evidence presented, any such inference must inevitably flow from the evidence actually presented and not from sheer speculation." *Clark v. Commonwealth*, 54 Va. App. 120, 139 (2009). The evidence must be "sufficient to take the question out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference." *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 369 (2003).

The question here is one of guilty knowledge. The notion that "an injury can amount to a crime only when inflicted" with some accompanying mens rea is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Morissette v. United States*, 342 U.S. 246, 250 (1952). So, did Cuffee's possession of an eight ball that tested positive for the presence of fentanyl and heroin mean that he made a deliberate choice to knowingly possess both substances? In my view, no reasonable juror presented with this question could have found,

beyond a reasonable doubt, that Cuffee knew that there was fentanyl in that bag. The evidence presented, along with all reasonable inferences, was not enough for any juror to do more than speculate about *which drug dealer* mixed the substances and whether Cuffee otherwise had knowledge that they had been mixed.

      I. The evidence presented leads the factfinder to speculate about Cuffee's knowledge rather than to draw reasonable inferences.

The majority concludes that the following is a permissible inference: Cuffee is a drug dealer and it is not unusual for drug dealers to mix heroin and fentanyl to increase their profits (according to the Commonwealth's expert at trial), so it is reasonable to assume Cuffee knew the specific bag in his possession contained both heroin and fentanyl. But none of the direct or circumstantial evidence in this case supports this jump.

      A. The expert's testimony

The full context of the expert testimony in this case reveals why the majority's assumption fails to rise above pure speculation. Detective Souther testified that there are *different levels of drug dealers*, that an eight ball of heroin was not a user amount, and that "for all [she] knew" Cuffee had recently purchased the eight ball from another drug dealer and had not yet had the time to repackage into user quantities. Thus, a juror asked whether Cuffee knew about the presence of the fentanyl would also have had to guess at the answer.

Turning to the expert testimony in more detail, Detective Souther explained that there are high-level dealers, street-level dealers, and mid-level dealers. She described how dealers often mix other substances, like baking soda, into cocaine to increase the amount of product that they could sell. And she testified that it was not "unusual"[9] to see heroin and fentanyl mixed together

---

[9] This case has not raised the issue of whether expert testimony on the question of a defendant's intent is admissible under Virginia Rule of Evidence 2:704(b), or whether the U.S. Supreme Court's recent holding that expert testimony was admissible under Federal Rule of Evidence 704(b) on the question of whether an alleged "blind mule" had knowledge she was

because the fentanyl increased the potency of the heroin, which allowed for higher pricing. "[T]ypically," she explained, drug dealers would mix and rebag substances at home because "[o]bviously, they feel safe there." For this reason, she did not find it surprising that, when Cuffee was arrested, no baggies, scales, or razor blades were found in his car.

As to the bag of heroin in particular, Detective Souther confirmed that the officers at the scene could not tell that it also contained fentanyl by looking at it. She also explained that the eight ball amount in Cuffee's possession was not consistent with personal use since a typical heroin user uses heroin right away. And a typical user might use between a half gram and full gram a day. For this reason, in Souther's view, a dealer would buy an "eight ball" to repackage and sell it to multiple users later.

Testifying about the eight ball possessed by Cuffee, Souther said "Obviously, this isn't broken up, yet." When pressed by defense counsel as to why Cuffee would have this eight ball of heroin, in a single bag, without anything with him to break it up into smaller user amounts for sale (such as baggies, a scale, a razor, etc.), Souther reiterated that the repackaging would happen at home. So, she explained, "In my opinion, they would go back and probably repackage [the eight ball]. *For all I know, [Cuffee] just purchased that the day before*." (Emphasis added).

It is possible that Cuffee did not buy the eight ball already containing both heroin and fentanyl, and at his home, he has a separate supply of both fentanyl and heroin, and that he mixed them to create eight balls of heroin to sell at a higher price to some other dealer, who would then later break it up into small, user quantities. And perhaps he had only one eight ball

___

transporting drugs is relevant to answering that question. *See Diaz v. United States*, 144 S. Ct. 1727 (2024). When it comes to criminal intent, however, *Diaz* shows how the government might use expert testimony *combined with additional evidence* to allow reasonable inferences of guilt. There, on top of incriminating physical evidence, Diaz made numerous inconsistent and facially incredible post-arrest statements, including that she was in Mexico to visit her boyfriend but did not know where he lived and that she did not know his phone number, etc. *See* Brief for the United States, *Diaz v. United States*, 2024 U.S. S. Ct. Briefs LEXIS 282, at *10-11.

left when he was arrested. But it is also possible that a higher-level dealer somewhere up the stream had already cut the heroin with fentanyl to increase his own profits[10] and then sold it to Cuffee without Cuffee knowing this took place. None of the facts in the case create any reasonable inferences that would allow a juror to have decided between these possibilities without resorting to mere guesswork.

Many boxes of nut-free cookies at the grocery store bear a label stating that they were manufactured on shared equipment and may contain peanuts or tree nuts. This is because contamination may occur, even if a given cookie is not supposed to contain nuts. But it would be speculation to assume that the shop clerk selling a particular box of cookies actually knows whether it is contaminated or not simply because contamination is not unusual.

### B. Cuffee's historical and current drug dealing

That Cuffee is a drug dealer does all the work for the majority. But, as reviewed above, the Commonwealth's expert explained there are different levels of drug dealers. And that for all she knew, Cuffee purchased the eight ball in his possession the day before, from another dealer, and planned to cut it up into smaller amounts later for sale. For this reason, a defendant's history of drug distribution *could* lead to useful inferences in some cases. If, for example, Cuffee had any prior convictions involving fentanyl, a reasonable juror might be able to infer that he has experience with fentanyl and that his prior experience makes it likely that he has more access to fentanyl, or that he mixed the substances. Or, if Cuffee was found with any paraphernalia

---

[10] The majority's emphasis on a drug dealer's motivation to increase profits does not tip the scales from speculation to reasonable inference. In estimating Cuffee's potential profit for selling an eight ball of heroin, Detective Souther explained that the "profit margin" would "depend[] on how much the dealer is buying" from *another drug dealer*. Whether that other drug dealer is the one who mixed the substances, or whether it was Cuffee, or both, cannot be inferred from these facts.

- 24 -

suggesting that he had mixed, or cut, any drugs, that too might permit some supportable inferences.

But here, the evidence is that Cuffee possessed many different illegal substances that day; the vast majority were bags of cocaine and crack, some packaged in user quantities (according to the expert), and some in larger quantities. Cuffee's drug priors were exclusively for cocaine. That Cuffee had four bags that appeared to be powder cocaine, and two that appeared to be crack cocaine, does not create a reasonable inference that it was Cuffee who cooked only some of the powder cocaine in his possession to turn it into crack cocaine, and not some other higher-level dealer. Nor does it support the further leap that knowledge of techniques that apply to one controlled substance means that Cuffee knew that two entirely different controlled substances had been mixed together. Yet the majority endorses the same guesswork, assuming knowledge that cocaine could be turned into crack for profit reasons means Cuffee knew the eight ball he possessed was laced with fentanyl.

C. The lab report confirming the presence of fentanyl

The only way the Commonwealth's expert knew there was fentanyl mixed in the heroin was from reviewing the lab report. Without that lab report, there was no way to visually determine there was more than one substance in the bag. But the lab report does not specify the relative breakdown of heroin versus fentanyl in the 3.34 grams. The vast majority could have been fentanyl, with only a trace amount of heroin, supporting an inference that Cuffee knew the mixture contained fentanyl. Or the substance could have been 99.9% heroin, with only a trace amount of fentanyl, supporting an inference of accidental contamination. Without any more information about the composition of the mixture, no inference about knowledge can derive from the mere fact that the mixture tested positive for both substances.

D.  Evidence about how Cuffee described, or priced, the eight ball

Even if Cuffee purchased the eight ball from another dealer to resell it, it is possible he knew it was not pure heroin.  There is a lot of evidence that could have been introduced—but was not—to allow such an inference.  For example, evidence that Cuffee described or labeled the eight ball as something other than heroin.  Evidence that he described the heroin as particularly strong, or warned someone to be careful with it, or that a prior customer told him it was stronger than normal.  Or, given the expert testimony about the going rate of heroin, and that a mixture of heroin and fentanyl would sell for more, any evidence about the rate Cuffee was charging for the eight ball would have been relevant and allowed inferences one way or the other.  But there is no evidence about any of these things on this record.

II.  The majority's interpretation is contrary to our opinion in *Camann*.

The Commonwealth argued below that (regardless of information about how Cuffee described the eight ball, priced the eight ball, received the eight ball, etc.) "pretty much everything in this day and age contains fentanyl," and for this reason "it's very reasonable to conclude that if you are possessing some form of opioid, it's going to be some concoction of opioids."  In effect—the expert's testimony that it is not unusual to see heroin and fentanyl together should lead to the reasonable inference that anyone possessing one opioid has knowledge there is also some other opioid mixed in there.  Under this logic, it is irrelevant whether someone possesses an opioid to use it, or to sell it.  Mere possession of a controlled substance results in strict liability for possession of however many illegal substances may be mixed together—the very logic that *Camann* rejected.

The majority repeatedly underscores that Cuffee is a drug dealer motivated by profit to suggest its decision is limited in scope, and so its reasoning would not apply to drug users.  But

there is no logical reason why this is the case. If the majority believes that this is a reasonable inference:

> Cuffee is a drug dealer who bought drugs from another drug dealer. It is not unusual for drug dealers to mix heroin and fentanyl to increase their profits, so it is reasonable to assume Cuffee knew the bag in his possession contained both heroin and fentanyl.

Why would this not be a reasonable inference as well?

> Jane is a drug user who bought drugs from a drug dealer. Everyone knows it is not unusual for drug dealers to mix heroin and fentanyl to increase their profits, so it is reasonable Jane knew the bag in her possession contained both heroin and fentanyl.

And if this is a permissible inference, then our holding in *Camann*—that "whatever practical inconveniences may arise when the Commonwealth seeks multiple convictions for possessing a single mixture, we cannot dispense with the fundamental requirements for *each* conviction that 'knowledge is an essential element of the crime'"—will be rendered meaningless. 79 Va. App. at 441. Instead, the majority effectively walks back *Camann*, inviting "strict criminal liability for possessing each additional substance in the mixture beyond the first one," so long as it is not "unusual" for drug dealers to mix the two together. *Id.*

CONCLUSION

I cannot join Part II(A) of the majority opinion because I would hold that the Commonwealth failed to "produce evidence sufficient to allow a rational factfinder to conclude beyond a reasonable doubt that the defendant intentionally and consciously possessed the contraband with knowledge of its nature and character." *Garrick*, 303 Va. at 183. In reaching this result, I have not "f[ound] facts nor draw[n] inferences that favor the losing party that the factfinder did not." *Id.* at 182. Instead, I have shown why the majority's conclusion impermissibly allows a jury verdict to rest not on reasonable inferences, but on hunches and guesswork.

For all of his offenses, Cuffee received a combined sentence of 90 years and 12 months, with 45 years suspended. He received 20 years, with 10 suspended, for possessing the heroin in the eight ball, and another 20 years, with 10 suspended, for the fentanyl in that same eight ball. I would vacate the conviction for PWID of fentanyl.